UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
UNITED STATES OF AMERICA )
)
v. )
)      Crim. No. 1:20-cr-10128-MLW
KEENAM PARK, )
Defendant )
)
_____)

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Keenam Park ("Mr. Park") respectfully requests this Honorable Court to impose a twenty-four (24) month custodial sentence, 1000 hours of community service, a standard special assessment, restitution in the agreed amount and a period of supervised release. Considering all of the circumstances present in the Defendant's case as well as his personal characteristics, such as sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. §3553(a), yet still reflects the seriousness of the offense, promotes respect for the law and provides just punishment.

## MR. PARK'S BACKGROUND

Keenam Park is a 60-year-old first time offender who, admittedly, made incredibly poor decisions which have led him to his current state. Born in Seoul, South Korea, Mr. Park spent his childhood and most of his teenage years in South Korea with his parents, Myung Sang and Chong Cha, and his older brother, Johnney. In Korea, the Parks lived with Mr. Park's grandparents and he was raised in an environment of mutual love and respect among his family and extended family members. Among the values instilled in Mr. Park by his family was an appreciation for hard work and entrepreneurship. He was also deeply imbued with the family's strong Christian faith, which

1

he maintains to this day and which he has credited with helping to sustain him through his current situation.

In 1978, the Parks moved to East Los Angeles, California, which offered better educational and employment opportunities than the family could find in Korea. Demonstrating the work ethic that would inspire Mr. Park, both of his parents initially worked cleaning jobs to support the family, ultimately saving up enough to purchase and operate a convenience store in Los Angeles. Because Mr. Park had not yet graduated high school when his family left Korea, but he was too old to start over in an American Public High School, his parents sacrificed and saved for him to go to a private high school, San Pasqual Academy in San Diego, California, from which he graduated in 1981. His deep appreciation for benefits and opportunities offered to him, as an Asian immigrant, by attending a private American high school would later fuel his drive to offer this same opportunity to others through his company EduBoston.

Following high school, he attended Andrews University in Berrien Springs, Michigan, where he majored in biochemistry. Prior to completing his degree from Andrews University, he was accepted to the dental program at Harvard University in 1989. Unfortunately, before he could earn his degree, he had to leave Harvard in 1992 and return to Los Angeles to help out his family after their convenience store was destroyed in the riots which followed the Rodney King acquittal.

Throughout the years, Mr. Park has done what he could to assist his parents and his brother, both financially and emotionally. In 2015, his brother, Johnney, who was vacationing in Florida at the time, suffered a debilitating cerebral stroke and nearly died. Mr. Park travelled from Boston to visit with his Johnney in Florida every weekend for three months until he was transferred to the USC Medical Center in Los Angeles. Once his rehabilitation program was completed, his elderly parents took Johnney into their home to care for him.

In 2016, however, Mr. Park's parents were horrifically injured in a car accident which left his father in a coma and bedridden. Again, Mr. Park frequently travelled to California to visit them and coordinate their ongoing health needs and those of his brother. Although he did all he could over this time to support them financially as well, by early 2019 his business situation had deteriorated to the point that he could no longer continue to support them. His parents and brother subsequently moved to the Alta Vista Rehabilitation Center in Riverside, California, which they paid for through their Medicare and Medicaid benefits. *See* Exhibit A (Records from Alta Vista Healthcare & Wellness Centre). Mr. Park's father passed away in July 2019, however, he still remains close to his mother and brother, speaking to them weekly through video calls.

In 2005, Mr. Park met his wife, Sinyoung Park, while travelling for business in Korea. She later joined him in the United States, and they married in Brookline, Massachusetts in 2007. Thereafter, they had a daughter, Harin, who has been Mr. Park's one constant source of joy since her birth in 2012. Although the Parks enjoyed a strong, happy marriage for a number of years, his constant travel to Florida and then California to care for his brother and parents, followed by his financial troubles and the subsequent criminal investigation placed a terrible strain on their marriage. The couple separated in June 2019 and Sinyoung took Harin back to Korea where they currently reside in Seoul. Despite the pain it caused him, Mr. Park supported this decision in order to spare them the trauma caused by his current situation. He still speaks with his daughter several times a week via video call.

In the late 1990s, a friend of Mr. Park's living in Korea asked him assist with his child's application to an American school. Later after this student gained admission, more and more families began to seek out Mr. Park for assistance and he realized both the great potential and opportunity to help Asian students to obtain an American education, as he had been fortunate

enough to receive years earlier.  After the 2008 recession severely impacted his business, he began to refocus his business model towards on servicing the ever-growing number of students from China seeking to come to the United States for an education.  In 2010 he created a new entity, K&B Education Group, LLC, which operated under the name EduBoston with its principal office located in Allston, Massachusetts.  In time, the business grew, partnering with over 60 private high schools in 10 states and employing more than 100employees both in the United States and Asia.

Mr. Park took a strong interest in the welfare of both his EduBoston employees and the students they placed in high schools around the country.  Mr. Park paid for 100% of the premiums for the company's medical insurance at a time when it had less than 20 employees and was not legally required to provide them with any medical coverage.  On a more personal level,  Mr. Park paid $20,000 towards the private education of a developmentally disabled child of a former MBA in the finance department of EduBoston. Mr. Park also developed a friendship and professional relationship with a former EduBoston employee who went on to graduate from Harvard University, then loaning him money to buy a wedding ring when he was first starting out his career. In addition, Mr. Park believed strongly in supporting the schools with whom EduBoston partnered, making large donations to many of them, including a $50,000 charitable donation to Cape Cod Academy.  Through EduBoston, he also supported numerous local charities and organizations, such as Holden Little League baseball.

Mr. Park's strong Christian faith further fueled his desire to give back and help others. Through the Christian Conference BAM ("Business as Mission"), Mr. Park developed ties with missionaries from the African Leadership Foundation and provided training and mentoring to young business owners through Inter-serve Korea, a branch of BAM.  In 2015 he donated $500,000.00 to the North Gate church in Korea.  He also has provided financial assistance on a

smaller scale, such as the case with Young Jun Choi, a missionary for whom Mr. Park provided $3,000.00 a month over a three year period to provide housing and living expenses for Young and his family.

In sum, nearly every aspect of Mr. Park's life runs contrary to his offense of conviction. Mr. Park is known as a gentle person incapable of harming anyone, who never had any mental health issues, and, as reflected in the numerous letters of support he has received, is known in both the local Korean community and beyond as generous and devoted person. Despite his present situation, he continually strives to be the best father, husband, son and brother he can be under the circumstances, and he worries far more about how the consequences of his actions will harm his family members than he worries about himself.

However, in an unquestionably misguided effort to salvage his company, discussed *infra.*, Mr. Park regrets that he let his judgment lapse and engaged in the instant offense conduct. While Mr. Park remains uncertain of his future and fears being without his family, particularly his wife and daughter, he is not without remorse for his actions and has never approached this instant matter with any level of mendacity. Although he has future employment prospects and the ability to earn income, he now owns little or no property and has no life savings and is deeply in debt. He has no safety net. His only saving grace throughout the pendency of this case has been the continued love and support of his family.

After consulting with counsel, Mr. Park, of his own accord, accepted responsibility and executed a plea agreement in this matter.  He is prepared to be sentenced by this Court.

## PRODECURAL HISTORY AND THE OFFENSE CONDUCT

On November 26, 2019, Mr. Park was arrested and was subsequently detained in federal custody pending payment of a $250,000 secured bond and an inspection of his release residence.

On December 13, 2019, he was released on personal recognizance with pretrial conditions, including home detention with location monitoring. Subsequently, the Court ordered that the Probation Office could approve discretionary leave.  On August 11, 2020, pursuant to the plea agreement with the Government, Mr. Park pled guilty to a one-count Information, which charged Wire Fraud, in violation of 18 U.S.C. § 1343.  On this same date, the Court revoked the defendant's release conditions and ordered him to be detained on a subsequent date pending financial disclosure submissions and approval of a release residence.

On August 18, 2020, the Court reconsidered it revocation of conditions and ordered the defendant released on the prior conditions and added new conditions prohibiting him from engaging in any businesses directly or indirectly, prohibiting him from soliciting money from anyone for any business purposes, and requiring him to seek approval from the Probation Office if he wishes to obtain money from anyone for living expenses or essential needs.

As reflected in the PSR, the Government has set forth, at some length, its version of Mr. Park's offense conduct.  It is important to note that Mr. Park does not contest the facts as set forth by the government, the seriousness of his offense or its consequences.  Likewise, Mr. Park fully accepts the responsibility both for his for his actions and the consequences that will follow.  Rather, he desires to explain the facts and circumstances that led to his decision to engage in the charged conduct.

Mr. Park organized EduBoston in 2010 with the goal of focusing his business on the expanding Chinese market of students seeking an education in the United States.  The business expanded rapidly and experienced steady growth through 2016, both in terms of numbers of students recruited and revenue.  Despite explosive growth, in some years reaching over 50%, Mr. park failed to put in place adequate accounting infrastructure and personnel to better track expenses

and manage the company's growth.  Beginning in 2013, Mr. Park began making investments in the stock market using company operating funds, with an initial investment of approximately $300,000.00. [1]   After initially making over $700,000.00 in profits, subsequent, significant downturns in the Shanghi and American stock markets resulted in the company losing  $3.2 million in the stock market in 2015.

Looking to make up for this shortfall and continue to expand the company's business, Mr. Park undertook an aggressive approach to increase the number of student recruits by expanding his marketing department and hiring more recruiters.  Unfortunately, EduBoston hit only 60% of its recruiting goals for the fall of 2017 and the company was facing a shortfall of operating capital. Desperate for a cash infusion, Mr. Park  withdrew $2 million from the company's operating fund and went to Foxwoods, where deposited the money in an "in-house account" in order to qualify for a bonus offer from Foxwoods of 10% of the deposited amount.   His intent was to use the "free" $200,000.00 bonus money to gamble in order to raise money for company.    Unfortunately, he lost the entire amount of the bonus money and the deposited funds over the course of two days. Nonetheless, Mr. Park was able to keep the company going and again undertook efforts to increase enrollments for the 2018 academic year to a level that would bring financial stability to the company.

Unfortunately, due to factors beyond Mr. Park's control, such as increased competition for Chinese students and increasing numbers of elite private schools opening in China itself, EduBoston enrolled only 58 students, its lowest amount since the company first opened.  By arranging for acquisitions of competitors Mr. Park was able to get more students and capital to

---

[1] It bears noting that the funds used by Mr. Park to do this were operating funds of the company, as opposed to money received and escrowed for tuition payments and related expenses for incoming students.

keep the company operating, but it was still facing an imminent loss of operating capital.  To his regret, Mr. Park withdrew $1 million of operating capital from the company, again, with the intention of raising additional capital by gambling at Foxwoods. Mr. Park again lost the bonus money, however, plus an additional $500,00.00.  He deposited the remaining $500,000.00 back into the company's operating account.

By late 2018-early 2019, the company was clearly in financial trouble and Mr. Park was undertaking great efforts to try to save it.  He borrowed approximately $2 million from so-called "hard money" lenders to keep the company's operations afloat.  He also took out a $600,000.00 home equity line of credit on his house and persuaded his wife to withdraw approximately $400,000.00 from her personal brokerage account to put into company for operational capital.  He also began selling off other assets, like his parents' home in California and his personal vehicle and putting the money back into the school.

In 2018, in an effort to differentiate the company in what was becoming an increasingly competitive industry, Mr. Park decided to transform its business model from in-person  recruiting model to an online recruitment model, covering a broader Asian market than just China.  To accomplish this, however, required the company in invest nearly $2million for the necessary online platform development.  In order for the new online platform, known as EduHup, to provide more options to its customers, as well as make up for lost business volume following the past two years of poor recruiting numbers, Mr. Park also purchased two competing recruiting agencies in Pennsylvania and California.  Although this drained still more capital from the company, the hope was that the increased market share and volume would quickly offset the loss.   However, the traditional, offline recruitment for 2019 was again below projections and the retention rate of students from its newly acquired companies was unexpectedly (and devastatingly) low.  It was at

this point when Mr. Park began to realize that the company's finances may have passed the point of no return.

In April 2019, Mr. Park advised his General Manager of the company's financial struggles and requested that he develop a plan to downsize the company to keep it afloat financially. When presented with the downsizing plan, however, Mr. Park balked at the number of employees that would lose their jobs and instead undertook aggressive efforts to sell the company instead. Unfortunately, by June 2019, when it became clear that the company would not be able to meet its financial obligations for the coming school year, Mr. Park opted not to notify the partnering schools and families that EduBoston would not be able to make tuition payments for the coming year. Instead, he continued to accept payments from the families in an effort to present the company as viable to investors such as the Bright Scholar Education Group, with whom he was actively and aggressively negotiating to sell EduBoston in order to obtain sufficient capital to make the necessary tuition payments and keep the employees on board.

Realizing that he could no longer manage to correct the situation himself, Mr. Park brought in a "turn around" team consisting of David Reier, a bankruptcy attorney with over 35 years of experience and Ross Honig, C.P.A., a highly-regarded specialist who has performed over 250 turnarounds and restructurings over a 40-year career. There is no dispute that Mr. Park worked diligently and honestly to assist with their efforts to rescue EduBoston.

After evaluating the company's books and records, Mr. Honig quickly came to realize that, while the company would not, in fact, be able to make most of the tuition payments for the coming school year, the company itself, if run more professionally, was still a viable entity that could be profitable and, in time, pay its outstanding debts. In order to accomplish such a turnaround, however, the cooperation of the affected schools was necessary. To that end, a meeting was held

with representatives of the various schools at which time a reorganization plan developed by Mr. Honig was presented, which outlined a strategy as to how the schools could all be paid in time, without jeopardizing the ability of the students to continue their education.  To his credit, Mr. Park also addressed the group and fully and frankly admitted his shortcomings and failings in his management of EduBoston and his responsibility for bringing matters to such a point.  Ultimately, the schools rejected the reorganization plan and EduBoston began liquidating all of its assets. Throughout this process of attempted reorganization and liquidation, Mr. Park fully cooperated with his turnaround team both to formulate a plan and later to assist with the liquidation of the company's and his personal assets.

Mr. Park fully and completely accepts responsibility for his mismanagement of the company and reckless use of company assets that led him ultimately commit wire fraud by accepting tuition payments from families that were not then forwarded to the respective schools. Mr. Park understands the wrongfulness of his actions and the financial and emotional toll they have taken on everyone involved, particularly the families of the students who had to pay tuition twice.  Moreover, Mr. Park appreciates that his actions took an emotional and financial toll on own his family and put them through a great deal of pain.

On balance, however, it must be noted that Mr. Park was never intentionally losing or otherwise misappropriating the company's money in an effort to benefit himself.  At no point did Mr. Park ever intend to purposefully deprecate company accounts for his own gain. He has not approached this matter with hubris at any time and has never purported to abdicate his responsibility for the failure of the business. He genuinely made every effort to try to turn the company around and minimize the losses to the families and the schools, particularly when he could have simply walked away and taken his money back to Korea.  Instead, he chose, before the

commencement of <u>any</u> legal actions against him to liquidate and reinvest what assets he could and admit his mistakes and wrongdoing.

## **AUTHORITY AND ARGUMENT**

I.     *Sentencing Standards Under Booker, Gall and Kimbrough Allow this Court Broad Discretion to Impose Sentences Below the Sentencing Guidelines Range*

The applicable legal standards are established and by now, well-rehearsed. With the Supreme Court decisions in *United States v. Booker*[2], *Gall v. United States*[3], and *Kimbrough v. United States*[4], federal sentencing has undergone dramatic changes, and the sentencing options available to district courts have significantly broadened in the wake of *Booker* and its progeny.[5] No longer are district courts bound by the strictures of the Guidelines or even permitted to presume that the Guidelines provide the appropriate sentence in a given case.

Of course, the Guidelines do remain the starting point and the initial benchmark. Post-*Gall*, however, "the district court's discretion in determining a defendant's sentence is very broad; once the guidelines sentencing range is properly calculated, 'sentencing becomes a judgment call' for

---

[2] 543 U.S. 220 (2005).

[3] 128 S.Ct. 586 (2007).

[4] 128 S.Ct. 558 (2007).

[5] See, e.g., *U.S. v. Taylor*, 532 F.3d 68, 69 (1st Cir. 2008) ("The Court's decision in *Gall*, combined with its decisions in *Kimbrough* ... and *Rita v. U.S.*, 127 S.Ct. 2456, ... (2007), makes clear that in the post-*Booker* world, district judges are empowered with considerable discretion in sentencing ...."); *U.S. v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008) (district court has "broader freedom than it did before *Kimbrough*"); *United States v. Rodriguez*, 527 F.3d 221,225 (1st Cir. 2008) ("In *Gall*, ... the Justices expounded further on a district court's authority to vary from the guidelines, emphasizing that district courts have wide latitude in making individualized sentencing determinations"); *U.S. v. Politano*, 522 F.3d 69, 73 (1st Cir. 2008) ("In view of the Supreme Court's recent decision in *Gall*, we emphasize that the broad discretion afforded to the district court is paramount"); *U.S. v. Martin*, 520 F.3d 87, 90 (1st Cir. 2008) ("*Gall* makes clear that courts of appeals must grant district courts wide latitude in making individualized sentencing determinations"); see also *U.S. v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming sentence which court had twice previously vacated in light of Gall's broader definition of the deference given to district judges' sentencing decisions).

the court, and the court may construct a sentence varying from the guidelines sentencing range 'based on a complex of factors whose interplay and precise weight cannot even be precisely described."[6]  Moreover, post-*Kimbrough*, sentencing courts may "deviate from the guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission."[7]

As the Supreme Court stated in *Booker*, the guideline provisions of the United States Sentencing Commission are advisory in nature. Although this remains accurate statement, the Supreme Court's jurisprudence on criminal sentencing has subsequently evolved even further from the mandatory nature of the Sentencing Guidelines towards virtually unlimited judicial discretion.[8] Under *Booker,* the Supreme Court held that the Sentencing Guidelines were "effectively advisory" and that sentencing courts were required to "consider Guideline ranges" but were permitted to "tailor the sentence in light of other statutory concerns" under 18 U.S.C. § 3553(a).[9] The Supreme Court further expanded a district court's discretion through the twin cases of *Gall* and *Kimbrough*.  Analyzed concurrently, the crux of these two cases are: (1) the Sentencing Guidelines are only advisory in nature; (2) there is no rule requiring "extraordinary circumstances" to justify sentences outside of the Guideline's range; (3) a presumption of unreasonableness for sentences outside of the Guideline's range is impermissible; and (4) in order to impose a sufficient, but not greater than necessary, sentence, district courts may use a combination of the Sentencing

---

[6] *U.S. v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008), quoting *Martin*, 520 F.3d at 92. To the extent there exist "sound, case-specific reasons" to do so, a sentencing court is authorized to deviate from the Guidelines. *Martin*, 520 F.3d at 91. The post-*Gall* sentencing inquiry, after the court has calculated the GSR, is "broad, open-ended, and significantly discretionary." Id. at 92.

[7] *Politano*, 522 F.3d at 74, quoting *Martin,* 520 F.3d at 96; see, e.g., *U.S. v. Vanvliet*, 542 F.3d 259, 271 (1st Cir. 2008).

[8] See *Gall v. U.S.,* 128 S.Ct. 586 (2007); *Kimbrough v. U.S.,* 128 S.Ct. 558 (2007).

[9] *Booker*, 543 U.S. at 245.

Guidelines, the § 3553(a) factors, and other non-statutory factors, including a judge's disagreement with the sentence obtained by the Guidelines, to arrive at an appropriate sentence.[10]

In *Gall*, the Supreme Court held that district courts must follow a three-step process to determine a sufficient sentence.

First, the court should begin by correctly calculating the applicable Sentencing Guideline range.[11]

Second, after giving both parties an opportunity to argue for what sentence they deem appropriate, the district court should then consider all the enumerated factors under Section 3553(a) in order to determine whether they support the sentence requested by a party.[12] "In doing so, [the district court] may not presume that the Guidelines range is reasonable.  [The district court] must make an individualized assessment based on the facts presented."[13]  If the court determines that a departure is appropriate, it must consider the "extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance."[14] However, there is no requirement that such departure needs to be based on "extraordinary circumstances," and, when reviewing a sentence, appellate courts are not permitted to apply a presumption of unreasonableness for sentences outside the Guidelines range.[15]

Third, after the determination of an appropriate sentence, the district court must "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."[16] Similarly, in *Kimbrough*, the Supreme Court issued an opinion

---

[10] *Id.*
[11] *Gall,* 128 S.Ct. at 596.
[12] I*d.*
[13] *Id.* at 596-97.
[14] *Id*., at 597.
[15] *Id*., at 595.
[16] *Id*., at 597.

holding that a district court has the discretion to issue a sentence outside the Guidelines range based on the court's opposition to the result obtained under the Guidelines—even if the departure is based on the district court's disagreement with the Guidelines itself.[17]

II. *Applying Factors Under 18 U.S.C. §3553(a) to the Circumstances of Mr. Park's Case Supports a Departure From the Sentencing Guidelines*

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

b. to afford adequate deterrence to criminal conduct;

c. to protect the public from further crimes of the defendant; and,

d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, §3553(a) further directs courts to consider the following factors:

1. "the nature and circumstances of the offense and the history and characteristics of the defendant"(§3553(a)(l);

2. "the kinds of sentences available"(§3553(a)(3);

3. "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§3553(a)(6); and,

4. "the need to provide restitution to any victims of the offense." (§3553(a)(7).

---

[17] *Id.,* at 575.

Section 3553(a) directs district courts to impose a sentence sufficient, but not greater than necessary.[18]  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings, that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure."[19]  In certain cases, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."[20]  Mr. Park respectfully asserts that this is such a case. Applying the §3553(a) and other relevant factors establishes that Mr. Park's recommended sentence would constitute a sufficient sentence under the circumstances.

### A. Nature and Circumstances of the Offense and History and Characteristics of the Defendant--§3553 (a)(1)

An examination of the nature and the circumstances of the offense and Mr. Park's history and characteristics demonstrate that his actions were an aberration and a temporary lapse in judgment, rather than the product of a career criminal. Before this instant case, Mr. Park was a hard-working and family-oriented individual, who had never been charged with a crime.  As in *Gall*, he presents a "small flood" of letters from relatives and friends[21] "uniformly praising" his character and ethics and further establishing that his actions in this case were an isolated incident in his life.[22]*See* Exhibit B (Letters in Support of the Defendant)

---

[18] 18 U.S.C. § 3553(a); *Gall*, 128 S.Ct., at 596 n.6.
[19] *Id.,* at 598.
[20] *Id.,* at 599.
[21] See attached, **Exhibit A**: Multiple Letters of Support From Friends, Colleagues and Family.
[22] See *Gall*, 128 S.Ct. at 593.

Although Mr. Park clearly mismanaged the company for the last few years of its existence, it was not until the Spring of 2019 that he made the conscious decision not to notify the families and schools that the company could not make the tuition payments, yet continued to fraudulently accept such payments. While the company accepted dozens of payments under the false pretenses created by Park's non-disclosure, resulting in millions of dollars of losses, it was at the end of the day, the result of a single decision made by Park, under extreme financial duress, not to disclose the company's true financial picture. Thus, it was essentially an instance of aberrant behavior. This is particularly true when viewed in the context of Mr. Park disposing of his own assets and putting the money back into the company and engaging a turnaround team to salvage the company and ultimately make all parties whole – all before any legal action was taken or even threatened against him.

When his actions to save the company are considered with the numerous letters attesting to his good character, it is clear that his decision to fraudulently withhold dire financial situation of his company, while continuing to accept tuition payments, is clearly at odds with his overall nature. Thus, the "nature and characteristics of the offense and nature and characteristics of the Defendant" weigh in favor of a reduced sentence. *See* 18 U.S.C. §3553(a)(1).

In considering Mr. Park's personal characteristics, then one which most notably defines him is his love of family. Indeed, Mr. Park's family circumstances are, and respectfully should be considered by the Court, to be additional basis for the requested sentence, pursuant to §3553(a)(1). Both his mother and brother are confined to assisted living facilities in California and unable to take care of themselves. In light of their ages (particularly his mother at 87 years old) and medical conditions, it is highly unlikely that either one of them will live long enough to see Mr. Park again should he receive a Guideline Sentence. In addition, Mr. Park's wife and daughter have had to

essentially flee the country to avoid the unwanted scrutiny and criticism that has inevitably fallen upon them from the community.  It is his fervent desire to bring his family back together again as soon as possible.  A lengthy term of incarceration will delay and hinder the possibility for family reunification, particularly during a time when his daughter is entering her developmental years and needs her father in her life.

Simply put, every aspect of Mr. Park's life runs contrary to his crime of conviction.  He is a good husband, father, and member of his community for whom helping others has been a way of life.  While Mr. Park understands that, ultimately, his misdeeds are the cause of any further misfortune he or his family suffers, and he acknowledges that some punishment is merited, he respectfully asks the Court to temper its sentence in recognition of the good he has done for society and the needs of his family.

*Need for the Sentence Imposed—§ 3553(a)(2)*

This factor instructs the Court to consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter crime, protect the public from the defendant, and provide the defendant with needed medical care in the most effective manner.[23] It is important to note that Mr. Park does not contest the seriousness of his offense or its consequences, nonetheless, he respectfully submits that the requested sentence of 24 months, when considering the totality of the circumstances, including his extraordinary efforts to save the company and how he fully accepted responsibility for his actions at the creditors meeting before any civil or criminal proceedings had commenced, provides just punishment for his actions, while fully reflecting the seriousness of the offense.  Such a sentence provides more than adequate deterrence against his committing future criminal conduct as he has already seen the

---

[23] 18 U.S.C., §3553(a)(2) (2006); *Gall*, 128 S.Ct. at 596.

devastating consequences his actions have had upon himself and his family. *See* §3553(a)(2)(B).
Likewise, it will serve to deter others as they will realize that committing fraud will result in prison
time.  There is no need to protect the public from Mr. Park because his offenses did not involve
any sort of physical harm and because he does not have violent felony convictions in his criminal
record. He does not pose a threat to the community.

B. *Kinds of Sentences Available*

This factor is intended to accord "flexibility" to sentencing judges by "provid[ing]
alternatives to incarceration where necessary."[24] For example, probation, home detention and
community service are available alternatives to extended imprisonment because they are permitted
through variance under *Booker* and *Gall*. As considered more fully under factor (a)(5), infra,
"utilization of alternatives to incarceration in appropriate cases" motivated the institution of the
Guidelines and is intended to be undertaken in a manner complimentary to their policies.[25]

C. *Kinds of Sentence and the Sentencing Range Established by the Guidelines*

In *Gall*, the Supreme Court reaffirmed that "the Guidelines are only one of the factors to
consider when imposing sentence, and § 3553(a)(3) directs the judge to consider sentences other
than imprisonment."[26] The generalities of the Guidelines can be unjust and contrary to reason. In
some cases, the sentence suggested by the Guidelines is not appropriate, as one size cannot be said
to fit all. No chart of numbers will ever fully contemplate or quantify the endless variations of the
human experience. The unique facts of this case justify variance from that range and warrant the
imposition of Mr. Park's recommended sentence.

---

[24] *U.S. v. K*, 160 F. Supp. 2d 421, 431 (E.D.N.Y. 2001).
[25] *Id*., at 432.
[26] *Gall*, 128 S. Ct. at 602.

### D. Pertinent Policy Statements

Here, Mr. Park's requested sentence of 24 months incarceration, which constitutes a sufficient sentence under the circumstances, is in line with the public policies of the Sentencing Guidelines. The Sentencing Reform Act of 1984[27], which created the United States Sentencing Commission and delegated to that Commission the authority to create the Guidelines, was enacted in part to address prison overcrowding.[28] In the Sentencing Reform Act, Congress instructed the Commission to formulate the Guidelines "to minimize the likelihood that the Federal prison population will exceed the capacity of Federal prisons."[29] "[U]ndergirding the federal sentencing reform movement was the notion that prison overcrowding or costly expansion could best be controlled through selective incapacitation and utilization of alternatives to incarceration in appropriate cases."[30] "Discretion to impose alternatives to incarceration was to be an important means of eliminating prison overcrowding under the Act."[31]

### E. Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires judges to consider the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct.[32]  Under this instruction, district courts must take account of sentencing practices in other courts and the 'cliffs' resulting from the statutory mandatory minimum sentences. To reach an appropriate sentence, these disparities must be weighed against the other § 3553(a) factors."[33] Here, the

---

[27] Pub.L. No. 98-473, § 211, 98 Stat.1987, 1989 to 90 (1984).
[28] *K*, 160 F. Supp. 2d at 432. ("What is often ignored in rigidly applying the current Guidelines, is another of the statute's aims — reducing prison overcrowding.").
[29] 28 U.S.C. § 994(g) (2006).
[30] *K*, 160 F. Supp. 2d at 432.
[31] *Id.*
[32] *Gall*, 128 S. Ct. at 599; *see also, Kimbrough*, 128 S. Ct. at 574.
[33] *Kimbrough*, 128 S. Ct. at 574.

requested sentence, while undoubtedly a significant departure from the otherwise applicable Guidelines recommendations, is still largely in line with sentences imposed upon similarly situated defendants who have committed similar crimes.

### III.    Application to Defendant's Case

Applying the above factors, this is a case that warrants the imposition of Mr. Park's requested sentence of 24 months incarceration. Mr. Park has recognized his mistakes and is remorseful. He has accepted responsibility for his actions and has never stated or implied anything to the contrary from the outset of this prosecution, or prior to it. His indictment and conviction have severely damaged his reputation. His life and livelihood have already been destroyed as a result of his admitted mistakes. Sentencing him to the Government's recommended sentence of 51 months would be "greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C.A. § 3553(a)."[34]

### SENTENCING RECOMMENDATION

Mr. Park has no prior criminal record and a family who depends on him financially and emotionally. There is no question that the circumstances giving rise to this case are sad for all parties involved, including the affected schools and families, and that Mr. Park sincerely regrets his conduct. This is not stated to excuse or minimize his conduct, rather, to emphasize that he is not an immoral man without values or without regard for social responsibility. The letters sent by friends and family state the case for leniency eloquently.

Mr. Park has fully accepted responsibility.[35] His requested sentence is less about the applicability of the government's loss calculation and more a reflection of human circumstances

---

[34] *Id.*, at 565.

[35] Consistent with his accepting responsibility for his actions, Mr. Park has begun counseling for his gambling issues. While his use, and subsequent loss of company funds at Foxwoods was

of a non-violent, first-time offender. Mr. Park recognizes that this Court considers many factors in every sentencing before it, where the often-singular issue is how best, not being immune to the infallible human condition, to arrive at an appropriate sentence. No doubt, this case is important; but countervailing interests should prevail. The stigma of being a criminal, particularly for an honorable man such as Mr. Park, is a real and continuing punishment, carrying its own consequences including public ridicule, humiliation, shame and restriction of opportunities.

Society would not benefit from Mr. Park's lengthy incarceration. Mr. Park has spent his life loving and supporting his family and working to help international students find places of study in American schools. He is a good and caring person and an example to others. What can truly be achieved now is something far deeper and more meaningful. A lesson about humility, clemency, service to the government and earned second-chances.

Given the offense conduct, the underlying circumstances of his life, his genuine remorse, for the foregoing reasons, Mr. Park respectfully submits that the Court is uniquely justified in sentencing him to a 24 month custodial sentence, 1000 hours of community service, a standard special assessment, restitution, and a period of supervised release, which would constitute a fair and just sentence under the circumstances and would be undoubtedly "sufficient but not more than necessary" to meet the goals of §3553(a).

For the above-stated reasons, Mr. Park respectfully requests the Court to adopt his sentencing recommendation.

---

unrelated to the scheme alleged in the charged conduct, Mr. Park realizes that his actions in gambling company funds significantly contributed to the company's dire financial straits, which ultimately led him to fraudulently collecting tuition money without forwarding it to the schools. Meeting his gambling problem head-on through treatment will ensure that he does not find himself in a similar situation in the future, thereby reducing his (already low) risk of recidivism.

Respectfully Submitted:

KEENAM PARK
By and through his Attorneys:

Dated: October 19, 2020

*/s/ Paul J. Andrews*
ANDREWS LAW OFFICE, LLC
Paul J. Andrews, BBO No. 558574
14 Saint Joseph Street, Suite 200D
Rapid City, SD 57701
Tel.:    (605) 718-4001
paul@andrewslawofficellc.com

Vikas S. Dhar, BBO No. 657539
vikas@dharlawllp.com



1 Constitution Wharf, Suite 320
1 Constitution Road
Charlestown, Massachusetts 02129
Office: 617.880.6155
Mobile: 617.935.6733
Fax: 617.880.6160

## CERTIFICATE OF SERVICE

I, Paul J. Andrews, hereby certify that a true and accurate copy of this document, and all supporting documents, if any, have been delivered by ECF upon all parties registered with CM/ECF in this matter on the date above.

*/s/ Paul J. Andrews*
Paul J. Andrews